# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **WOLVERINE BARCODE IP, LLC** | |
| | |
| **v.** | **Case No. 2:26-cv-00153-JRG** |
| | **(Lead Case)** |
| **WALGREEN CO.** | |
| | **Case No. 2:26-cv-00021-JRG** |
| **JAMBA JUICE, LLC.** | **(Member Case)** |

**PLAINTIFF WOLVERINE BARCODE IP, LLC'S OPPOSITION TO
DEFENDANT JAMBA JUICE, LLC'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

*TIMELY AND ERRONIOUSLY FILED IN
<u>MEMBER CASE ON APRIL 27, 2026 AS ECF NO. 15</u>*

**TABLE OF CONTENTS**

I. INTRODUCTION ...............................................................................................................1

II. LEGAL STANDARD ........................................................................................................2

      A. Failure to State a Claim.............................................................................................2

III. ARGUMENT ....................................................................................................................4

      A. Wolverine Plausibly Alleges Direct Infringement....................................................4

            1.      The Complaint and Exhibit B map each limitation of claim 1 to Jamba Juice's Rewards......................................................................................................4

            2.      Jamba Juice's "product barcode" argument raises factual and claim construction issues ...............................................................................................8

            3.      Wolverine need not prove at the pleading stage that Jamba Juice alone "practices" each step........................................................................................10

      B. The Complaint Also Plausibly Alleges Divided Infringement Under Akamai...................11

      C. Wolverine's Indirect Infringement Allegations Are Sufficient...........................................13

            1.      The Complaint plausibly alleges an underlying act of direct infringement...........13

            2.      Induced infringement is pled with more than labels and conclusions ...................13

            3.      The Complaint adequately pleads contributory infringement ...............................14

      D. In the Alternative, Wolverine Should Be Granted Leave to Amend .................................15

IV.  CONCLUSION.................................................................................................................15

## TABLE OF AUTHORITIES

### I.     TABLE OF AUTHORITIES

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    797 F.3d 1020 (Fed. Cir. 2015) ...................................................................................... 11
*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ..................................................................................................... 4
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................................... 2
*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ................................................................................................... 4, 8
*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................................................... 3
*Bell v. Miller*,
    Case No. 1:18-cv-522, 2018 U.S. Dist. LEXIS 151438 (W.D. Mich. 2018) ...................... 15
*Choon's Design, LLC v. Zenacon, LLC*,
    No. 2:13-CV-13568, 2015 WL 539441 (E.D. Mich. Feb. 9, 2015) .................................... 3
*Decker v. Infante*,
    *Case*, No. 19-11654, 2023 U.S. Dist. LEXIS 136881 (E.D. Mich. Aug. 7, 2023)............... 15
*Disc Disease Sols. Inc. v. VGH Sols., Inc.*,
    888 F.3d 1256 (Fed. Cir. 2018) ........................................................................................ 3
*Doe v. Baum*,
    903 F.3d 575 (6th Cir. 2018) ............................................................................................ 3
*Hunton Energy Holdings, LLC v. HL Seawater Holdings, LLC*,
    539 F. Supp. 3d 685 (S.D. Tex. 2021) ............................................................................... 3
*Lifetime Indus., Inc. v. Trim-Lok, Inc.*,
    869 F.3d 1372 (Fed. Cir. 2017) ................................................................................. 2, 8, 10
*Lyda v. CBS Corp.*,
    838 F.3d 1331 (Fed. Cir. 2017) ................................................................................... 11, 13
*Michigan Motor Techs. LLC v. Hyundai Motor Co.*,
    Civil Action No. 17-CV-12901, 2018 U.S. Dist. LEXIS 226517 (E.D. Mich. Aug. 9,
    2018) .................................................................................................................................. 3
*Mullen Indus. LLC v. Samsung Elecs. Co.*,
    No. 2:24 CV 00049 JRG, 2024 WL 4870768 (E.D. Tex. Nov. 21, 2024) .................... 11, 12
*Nalco Co. v. Chem Mod, LLC*,
    883 F.3d 1337 (Fed. Cir. 2018) ........................................................................... 3, 8, 10, 13
*Swift v. Cnty. of Wayne*,
    No. 10-12911, 2011 WL 1102785 (E.D. Mich. Mar. 23, 2011) ........................................ 3

**Constitutional Provisions & Statutes**

35 U.S.C. § 271 ........................................................................................................................ 3

**Rules & Regulations**

Fed. R. Civ. P. Rule 8 .......................................................................................................... 2, 8
Fed. R. Civ. P. Rule 12 ................................................................................................... 1, 3, 10, 15

Plaintiff Wolverine Barcode IP, LLC ("Wolverine") files this Opposition to Defendant Jamba Juice, LLC's's ("Jamba") Motion to Dismiss for Failure to State a Claim Under Fed. R. Civ. P. 12(b)(6) ("Motion").[1]

## I. INTRODUCTION

Jamba asks the Court to dismiss a detailed patent infringement complaint and a 30 page, element by element claim chart at the pleading stage by inviting the Court to accept Jamba's factual narrative about how its systems work and to construe claim terms, particularly "product barcode," in Jamba's favor. That is improper under Rule 8, Rule 12(b)(6), and controlling Federal Circuit precedent.

Wolverine's Original Complaint[2] ("the Complaint") identifies the patent-in-suit, U.S. Patent No. 9,280,689 ("the '689 Patent"),[3] and Wolverine's ownership by assignment.[4] The Complaint alleges that Jamba "maintains, operates, and administers systems, products, and services that conducting offline transactions that use a barcode as a method of personal identification that infringes one or more of claims 1–3 of the '689 patent, literally or under the doctrine of equivalents."[5] The Complaint further alleges that Jamba "put the inventions claimed by the '689 Patent into service (i.e., used them); but for Defendant's actions, the claimed invention embodiments involving Defendant's products and services would never have been put into service," and that "Defendant's acts complained of herein caused those claimed invention embodiments as a whole to perform."[6] Finally, the Complaint pleads direct, induced, and contributory infringement and incorporates by reference Exhibit B, a limitation by limitation chart

---

[1] ECF 9
[2] ECF 1
[3] ECF 1-1
[4] ECF 1, para 6-7.
[5] ECF 1, para 8.
[6] *Id.*

mapping claim 1 of the '689 Patent to Jamba's Rewards, its QR code based user identification, its account servers, and its in store scanning and transaction processes.[7]

These allegations, taken as true and read together with Exhibit B, more than satisfy the pleading standard. They plausibly state claims of direct and indirect infringement and put Jamba Juice on notice of what conduct is accused.

Jamba Juice' motion rests on the arguments that Wolverine's direct infringement theory is implausible and contradictory as to the "product barcodes" limitation;[8] that claim 1 of the '689 Patent necessarily involves divided infringement and Wolverine failed to adequately plead divided infringement under Akamai;[9] and that Wolverine's inducement and contributory infringement allegations are conclusory.[10]

Each argument either (a) seeks to resolve factual disputes and claim construction issues in Jamba's favor at the pleading stage, or (b) demands more detail than Rule 8 requires.[11] The motion should be denied.

## II. LEGAL STANDARD

### A. Failure to State a Claim.

The question before the Court is whether Wolverine's Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." [12] In a patent infringement case, "[t]here is no requirement for [the plaintiff] to 'prove its case at the pleading stage.'"[13] The Federal Circuit "requires that a complaint place the infringer on notice of what activity . . . is being accused of infringement."[14] Indeed, when evaluating the sufficiency of the

---

[7] ECF 1, para 9-11; ECF 1-2.
[8] ECF 9, pg 8.
[9] ECF 9, pg 8-9.
[10] ECF 9, pg 9-10.
[11] F.R.C.P. 8.
[12] *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).
[13] *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017).
[14] *id.*

complaint under a Rule 12(b)(6) motion to dismiss, the Court must "accept all of the plaintiff's factual allegations as true," "draw all reasonable inferences in the plaintiff's favor," and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief."[15] "If it is at all plausible (beyond a wing and a prayer) that a plaintiff would succeed if he proved everything in his complaint, the case proceeds."[16]  Hence, at the pleading stage, a plaintiff need not plead and prove its entire case.  Rather, for the case to proceed, a plaintiff simply needs to present "factual allegations" that "raise a right to relief above the speculative level."[17] It is defendant's burden to prove the "complaint does not permit the plausible inferences that the defendant is liable for the conduct alleged."[18]

To state a claim for patent infringement under 35 U.S.C. §271, a plaintiff need only give the defendant "fair notice" of the infringement claim and "the grounds upon which it rests."[19]  "Fair notice," in turn, requires the plaintiff to plausibly allege that the accused product meets "each and every element of at least one claim" of the asserted patent.[20] "A defendant has fair notice of a direct infringement claim if the complaint specifically identifies the allegedly infringing product and the patent the product infringes".[21] Simply put, Defendants have attempted to turn a motion to dismiss into a challenge of the merits of Plaintiffs patent claims. Where, as here, a complaint includes a detailed claim chart mapping each limitation of at least one asserted claim to concrete features of an accused product or service, courts regularly hold the pleading sufficient.[22]

---

[15] *Doe v. Baum,* 903 F.3d 575, 581 (6th Cir. 2018).
[16] *id*
[17] *Swift v. Cnty. of Wayne,* No. 10-12911, 2011 WL 1102785, at *2 (E.D. Mich. Mar. 23, 2011) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007))).
[18] *Choon's Design, LLC v. Zenacon, LLC,* No. 2:13-CV-13568, 2015 WL 539441, at *8 (E.D. Mich. Feb. 9, 2015).
[19] *Disc Disease Sols. Inc. v. VGH Sols., Inc.,* 888 F.3d 1256, 1260 (Fed. Cir. 2018).
[20] *Disc Disease*, 888 F.3d at 1260. See, also, *Michigan Motor Techs. LLC v. Hyundai Motor Co.,* Civil Action No. 17-CV-12901, 2018 U.S. Dist. LEXIS 226517, at *3 (E.D. Mich. Aug. 9, 2018).
[21] *Hunton Energy Holdings, LLC v. HL Seawater Holdings, LLC,* 539 F. Supp. 3d 685, 694 (S.D. Tex. 2021) (quoting *Disc Disease*).
[22] *Nalco Co. v. Chem Mod, LLC,* 883 F.3d 1337, 1350–55 (Fed. Cir. 2018) (reversing dismissal where district court effectively adopted defendant's non infringement theory and resolved factual disputes at Rule 12 stage).

Because Plaintiff's Complaint satisfies the plausibility standard of *Ashcroft* and *Bell Atlantic*[23] and provides Defendants with fair notice of infringement, Jamba's Motion should be denied.

## III. ARGUMENT

### A. Wolverine Plausibly Alleges Direct Infringement

#### 1. The Complaint and Exhibit B map each limitation of claim 1 to Jamba's Rewards

Wolverine alleges that Jamba "maintains, operates, and administers systems, products, and services" that carry out "offline transactions that use a barcode as a method of personal identification" and that these systems "infringe[] one or more of claims 1–3 of the '689 patent."[24] Wolverine further alleges that Jamba Juice "put the inventions claimed by the '689 Patent into service, i.e., "used them" and "caused those claimed invention embodiments as a whole to perform."[25]

Exhibit B provides an element-by-element mapping of claim 1 to Jamba's Rewards:

Step 1(a) – "providing a personal code to a person for their use to purchase goods." The chart identifies a unique customer digital ID that the person can use to buy Jamba products."[26] The claim chart quotes Jamba's Rewards Terms defining a "Transaction" as "purchasing Jamba Products, excluding gift cards, via the Jamba Rewards Account."[27] This maps the "personal code" to Jamba's unique rewards identifier used to purchase goods.

Step 1(b) – "converting said personal code . . . into barcode format to form a User ID Barcode" The chart shows the personal code being converted into barcode format to form a User

---

[23] *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009) and *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955 (2007).
[24] ECF 1, ¶ 8
[25] Id.
[26] ECF 1-2, pg 5-6).
[27] Id. citing https://www.jamba.com/legal#rewards-terms.

ID Barcode . . . including at least one special character, [DIFFERENT CODES, 'P'] to distinguish the barcode as a User ID Barcode . . . from a product barcode . . . ."[28]

It then shows the encoded personal code alongside the "my jamba rewards" QR code screen labeled, "Show this QR code to Jamba team member to earn banana points or redeem your reward while purchasing in store."[29]

The chart also identifies a Jamba branded retail product image as a "product barcode."[30] Thus, it explicitly distinguishes the User ID Barcode, rewards QR, from a product barcode on items for sale using a different code and special character.

Step 1(c) – "storing said personal code in said User ID Barcode format" and "in a User Vendor Management Server." The chart cites, "For example, Jamba allows the person to store the code . . . in the form of a User ID Barcode on their device so it can be used to buy Jamba products. At the same time, Jamba also stores this same code on its servers, so that purchases can be verified and processed electronically when the person buys products from a Jamba vendor."[31]

It labels Jamba's "SERVER(S)" referenced in Jamba's legal terms as the "User Vendor Management Server."[32]

Step 1(d) – "establishing a User Account in a User Vendor Management Server corresponding to said personal code." The chart identifies a "establishing a User Account . . . in a User Vendor Management Server . . . corresponding to said personal code . . . . For example, Jamba sets up a Jamba Rewards Account on its servers, and this account is linked to the unique code . . . .[33]

---

[28] ECF 1-2, pg 6-8.
[29] ECF 1-2, pg 10.
[30] ECF 1-2, pg 8.
[31] ECF 1-2, pg 8-10.
[32] ECF 1-2, pg 10-11.
[33] ECF 1-2, pg 11.

Step 1(e) – "depositing funds in said User Account to establish a credit limit." The chart identifies "ACCRUED POINTS AND REWARDS" and "POINTS AND REWARDS ARE CREDITS" from Jamba's Rewards Terms as "depositing funds" and "credit limit," respectively.[34] It explains that points and rewards "are credits that Jamba may revoke at any time" and that Jamba controls "the earning, crediting or use of Points or Rewards," mapping those credits to the "credit limit" in the user account.[35]

Step 1(f) – "conducting purchases at vendors each having a vendor server wherein each purchase includes scanning product barcodes including product price and said User ID Barcode with a product barcode scanner at the vendor cash register and transmitting both product barcodes and User ID Barcode to said vendor server." The chart states "conducting purchases at vendors each having a vendor server . . . wherein each purchase includes scanning product barcodes . . . including product price . . . and said User ID Barcode . . . with a product barcode . . . scanner . . . at the vendor cash register . . . and transmitting both product barcodes . . . and User ID Barcode . . . to said vendor server . . . ."[36]

The chart then goes on to explain that Jamba allows purchases at vendors, each of which has a server, a) during each purchase, the cash register scans both the product barcodes and the customer's User ID Barcode, and b) the scanned information, both product details and the User ID, is then sent to Jamba's server to process the transaction."[37]

It ties "product price" to menu items like "pumpkin smash – $7.19."[38] It uses Jamba's Rewards Terms describing earning points by "scan[ning] the QR code on your smartphone at the

---

[34] ECF 1-2, pg 13-14. 24.
[35] ECF 1-2, pg 112-13.
[36] ECF 1-2, pg 14.
[37] ECF 1-2, pg 14.
[38] ECF 1-2, pg 15.

time of purchase with the scanner at the check out counter" or "scan[ning] the bar code on the receipt . . . with the built in scanner in the App" to show the "scanner" and "vendor cash register."[39]

Step 1(g) – detecting the User ID Barcode at the vendor server, forwarding the ID Barcode and purchase price to said User Vendor Management Server." The chart explains "detecting the User ID Barcode . . . at the vendor server . . . and forwarding the ID Barcode and purchase price ['$7.19', '$8.69'] to said User Vendor Management Server . . . . For example, Jamba detects the User ID Barcode at its server and then records and forwards both the User ID and the purchase amounts (for example, $7.19, $8.69) to the server for processing."[40]

Step 1(h) – "comparing the purchase price with the funds in said User Vendor Management Server to determine if there are available funds within the credit limit . . . and if there are, sending an approval signal to the vendor server." The chart explains, "(h) comparing the purchase price ['$7.19', '$8.69'] with the funds in said User Vendor Management Server ['SERVER(S)'] to determine if there are available funds within the credit limit ['POINTS AND REWARDS ARE CREDITS'] in the User Vendor Management Server ['SERVER(S)'] account, and if there are, sending an approval signal ['receipt'] to the vendor server ['SERVER(S)'].

For example, Jamba compares the purchase amounts . . . with the available points and rewards credits in the customer's account on the server. If there are enough credits, the system authorizes the transaction and sends a receipt to the server."[41]

Step 1(i) – "forwarding the approval signal to the vendor cash register." The chart explains, "(i) forwarding the approval signal ['receipt'] to the vendor cash register. For example, Jamba

---

[39] ECF 1-2, pg 18-19, 25-27.
[40] ECF 1-2, pg 19.
[41] ECF 1-2, pg 22.

sends the receipt back to the vendor's cash register so the purchase can be completed and confirmed."[42]

Step 1(i) (repeat)– "repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode." The chart explains, "(i) repeating steps (f) through (i) for subsequent purchase transactions using said User ID Barcode. Jamba repeats steps (f) through (i) for each new purchase, using the same User ID Barcode to process transactions."[43] Jamba's Rewards Terms define "Transaction" as "purchasing Jamba Products . . . via the Jamba Rewards Account."[44]

Wolverine's Complaint incorporates this chart.[45] These detailed allegations identify the accused system, Jamba Rewards, describe its operation, and tie that operation to each element of claim 1. That is more than sufficient under Rule 8 and cases like *Lifetime* and *Nalco.*[46]

### 2. Jamba Juice' "product barcode" argument raises factual and claim construction issues

Jamba's motion attacks Wolverine's "product barcode" theory, focusing on Exhibit B's use of a Jamba branded retail snack image (with a barcode) pulled from Amazon and asserting that (a) such snacks are not purchased in Jamba stores with rewards, and (b) Jamba point of sale systems do not scan product barcodes. Jamba then invites the Court to accept those factual assertions and deem Wolverine's allegations "contradictory" and implausible.[47]

Jamba's argument fails at the pleading stage.

First, Exhibit B squarely alleges that, in Jamba transactions, product barcodes and User ID barcodes are scanned together at the register and transmitted to Jamba's servers. Step 1.6 of the

---

[42] ECF 1-2, pg 26.
[43] ECF 1-2, pg 28-29.
[44] Id. citing https://www.jamba.com/legal#rewards-terms.
[45] ECF 1, ¶ 9.
[46] F.R.C.P. 8;  *Lifetime Indus., Inc. v. Trim-Lok, Inc.,* 869 F.3d 1372 (Fed. Cir. 2017); *Nalco Co. v. Chem Mod, LLC,* 883 F.3d 1337, 1350–55 (Fed. Cir. 2018)
[47] ECF 9, pgs 1, 9–10.

claim chart states: ""During each purchase, the cash register scans both the product barcodes (for example, $7.19, $8.69) and the customer's User ID Barcode.

The scanned information — both product details and the User ID — is then sent to Jamba's server to process the transaction."[48] The chart also identifies Jamba's own instructions for earning points: for in retail store purchases, members can "scan the QR code on your smartphone at the time of purchase with the scanner at the check out counter," or "manually enter or scan the bar code on the receipt . . . with the built in scanner in the App."[49] Taking these allegations as true, it is at least plausible that Jamba uses machine readable product identifiers, product barcodes or their equivalents, in conjunction with the User ID barcode and scanners at the vendor cash register.

Second, the Amazon Jamba snack image is clearly used as an example of a "product barcode." Exhibit B's global definitions explicitly maps "product barcode" to "SEE IMAGE of barcode" (the snack packaging) while separately mapping the User ID barcode to the Jamba Rewards QR in the app.[50]  Wolverine's theory does not depend on that particular retail product being sold or redeemed in a particular way in Jamba cafes. The core allegation is that Jamba uses product barcodes, e.g., item barcodes or barcoded receipts, and a User ID barcode in the manner required by claim 1.

Third, Jamba is asking the Court to construe "product barcode" and to accept Jamba's non-infringement narrative about how its POS systems and rewards program operate, contrary to Wolverine's competing allegations. That is exactly what the Federal Circuit has cautioned against at the pleading stage. In *Nalco*, the Federal Circuit held that the district court erroneously imported an extraneous limitation and effectively decided a claim construction dispute on a motion to

---

[48] ECF 1-2, pg 14.
[49] ECF 1-2, pg 18-19, 25-27.
[50] ECF 1-2, pgs 8, 30.

dismiss.[51] The same error would occur here if the Court accepted Popeyes' characterization of its own systems and rejected Wolverine's contrary, plausible factual allegations.

At this stage, Wolverine need not prove that any specific snack product is scanned at Jamba registers with rewards. It need only plausibly allege that in the accused Jamba transactions, product barcodes and the User ID barcode are scanned by a product barcode scanner at the vendor cash register and transmitted to Jamba's servers. Exhibit B alleges exactly that. Jamba's disagreement is a factual and claim construction dispute that cannot be resolved on a motion to dismiss.

### 3. Wolverine need not prove at the pleading stage that Jamba alone "practices" each step

Jamba argues that Wolverine improperly confuses "the claimed method claims with system claims" by alleging Jamba "put the inventions claimed by the '689 Patent into service,"[52] and suggests Wolverine must show that Jamba, and not customers, performs each step. But at the Rule 8 stage, Wolverine is not required to "prove its case at the pleading stage." [53] To state a plausible direct infringement claim, Wolverine need only allege facts from which it is reasonable to infer that all steps of claim 1 are performed when Jamba operates and promotes its accused systems, whether those steps are carried out directly by Jamba's servers and systems or by customers whose actions are attributable to Jamba.

Wolverine alleges that Jamba Juice "maintains, operates, and administers" the accused systems[54] "put the inventions claimed by the '689 Patent into service," and caused those "claimed invention embodiments as a whole to perform."[29] [55] Exhibit B then details how each step (a)–(i) of claim 1 is implemented in the Jamba Rewards ecosystem. That is sufficient to plead direct

---

[51] *Nalco Co. v. Chem Mod, LLC*, 883 F.3d 1337, 1350–55 (Fed. Cir. 2018) (reversing dismissal where district court effectively adopted defendant's non infringement theory and resolved factual disputes at Rule 12 stage). *Nalco* 1347-1348ECF 1-2, pg 25.
[52] ECF 9, pg 4.
[53] *Lifetime Indus., Inc. v. Trim-Lok, Inc*., 869 F.3d 1372, 1379 (Fed. Cir. 2017).
[54] ECF 1, ¶ 8.
[55] ECF 1; ECF 9, generally.

infringement. The precise allocation of steps between Jamba and its customers, and the evidentiary proof of who performs what, are merits questions for discovery and summary judgment, not grounds for dismissal.[56] That is enough to plausibly infer that Jamba Juice uses a system that practices every step of the claimed method in the sense recognized by the Federal Circuit in *Akamai*.[57]

### B. The Complaint Also Plausibly Alleges Divided Infringement Under Akamai

Even if the Court concludes that claim 1 involves multiple actors, Wolverine has still pled a viable direct infringement theory under the divided infringement framework. Under *Akamai*, "[d]irect infringement under § 271(a) occurs where all steps of a claimed method are performed by or attributable to a single entity."[58]

A single entity is responsible for others' performance when it directs or controls that performance, including where it (1) "conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method," and (2) "establishes the manner or timing of that performance."[59]  To state such a claim, a plaintiff must plead facts permitting a reasonable inference that all steps are performed and that either direction/control or a joint enterprise exists.[60]

Here, the Complaint and Exhibit B plausibly allege all steps of the claimed method are performed. Exhibit B maps each step (a)–(i) of claim 1 to conduct in the Jamba Rewards ecosystem. Customer facing steps like "conducting purchases at vendors"[61] scanning product

---

[56] ECF 1-2.
[57] *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022–23 (Fed. Cir. 2015).
[58] *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015).
[59] *Id.*at 1023; See also *Lyda v. CBS Corp.,* 838 F.3d 1331, 1339–40 (Fed. Cir. 2017).
[60] *Id.* at 1023; See also *Lyda v. CBS Corp.,* 838 F.3d 1331, 1339–40 (Fed. Cir. 2017); *Mullen Indus. LLC v. Samsung Elecs. Co.,* No. 2:24 CV 00049 JRG, 2024 WL 4870768, at *3 (E.D. Tex. Nov. 21, 2024).
[61] ECF 1-2, pg 12-16.

barcodes and the User ID Barcode, and presenting the QR code at checkout. [62] Server side steps, storing codes, establishing and updating rewards accounts, comparing purchase prices to points/credits, sending receipts/approval signals, and repeating these operations, are performed by Jamba's "SERVER(S)" (User Vendor Management Server and vendor servers).[63]

Jamba's own Rewards Terms, quoted extensively in Exhibit B, show that Jamba conditions participation and benefits on customers performing specific steps in specific ways. A "Transaction" is "purchasing Jamba Products, excluding gift cards, via the Jamba Rewards Account."[64]  Points are "automatically added to a Member's account when purchase is completed via the App or the Website after signing in to the account."[65] To earn points for in store purchases, members must either "scan the bar code on the receipt . . . with the built in scanner in the App" or "scan the QR code on your smartphone at the time of purchase with the scanner at the check out counter," or have the cashier look up the account by phone number.[66] Jamba defines points and rewards as "CREDITS" in the account that Jamba "may revoke at any time" and reserves the right, in its sole discretion, to decide questions about "the earning, crediting or use of Points or Rewards" and "a Member's compliance with these Jamba Rewards Terms."[67]

Taken as true, these allegations show, Jamba conditions participation in its rewards program and the receipt of concrete benefits, that Jamba establishes the manner and timing of those steps.

Under *Akamai*, these facts permit a reasonable inference that all steps of claim 1 are performed and that customers' actions are attributable to Jamba through direction or control.

---

[62] ECF 1-2, pg 14-16, 28-29.
[63] ECF 1-2, pg 8-12, 19-27.
[64] ECF 1-2, pg 5-6, 28.
[65] ECF 1-2, pg 18-19, 25-27.
[66] *Id.*
[67] ECF 1-2, pg 13-14, 24.

Wolverine is not required at this stage to plead the magic words "directs or controls" or "joint enterprise"; it must plead facts supporting those concepts. [68] Exhibit B provides those facts.

Jamba's reliance on *Lyda* and *Mullen* is misplaced. In those cases, the complaints lacked concrete factual allegations linking the defendants' control or conditioning of benefits to the performance of specific claim steps. Here, by contrast, Wolverine has pled how Jamba's Rewards functions, how customers are required to use it to earn and redeem benefits, and how that use performs the method steps of claim 1.

### C. Wolverine's Indirect Infringement Allegations Are Sufficient

Jamba Juice also seeks dismissal of Wolverine's indirect infringement claims, arguing that there is no plausible underlying direct infringement and that the allegations of inducement and contributory infringement are conclusory. Neither contention is correct

#### 1. The Complaint plausibly alleges an underlying act of direct infringement

As discussed above, the Complaint and Exhibit B plausibly allege that all steps of claim 1 are performed by, or attributable to, Jamba under either a single actor or divided infringement theory. That is sufficient to support underlying direct infringement for purposes of inducement and contributory infringement.[69]

#### 2. Induced infringement is pled with more than labels and conclusions

Paragraph 10 of the Complaint states:

> "Defendant has and continues to induce infringement. Defendant has actively encouraged or instructed others (e.g., its customers and/or the customers of its related companies), and continues to do so, on how to use its products and services such as to cause infringement of one or more of claims of the '689 patent,

---

[68] *Lyda v. CBS Corp.,* 838 F.3d 1331, 1339–40 (Fed. Cir. 2017.
[69] See *Nalco,* 883 F.3d at 1355.

literally or under the doctrine of equivalents. Moreover, Defendant has known of the '689 patent and the technology underlying it from at least the filing date of the lawsuit. For clarity, direct infringement is previously alleged in this complaint."[70]

These allegations are grounded in the specific conduct described in ¶ 8 and Exhibit B. Jamba provides the rewards app, QR/User ID barcodes, Jamba Rewards Accounts, and servers; it publishes app store pages, menu pages, and Rewards Terms explaining how members must use the QR code and scanners to earn and redeem rewards and conduct "Transactions"; and Wolverine alleges that such use directly infringes claim 1.[71]

Wolverine has thus alleged knowledge of the '689 Patent (at least as of the filing date), that Jamba Juice' customers directly infringe when they use the accused systems as instructed, and that Jamba Juice specifically intends for its customers to use the systems in that manner by actively encouraging and instructing them to do so.

### 3. The Complaint adequately pleads contributory infringement

Paragraph 11 alleges,

"Defendant has and continues to contributorily infringe. Defendant has actively encouraged or instructed others (e.g., its customers and/or the customers of its related companies), and continues to do so, on how to use its products and services (e.g., conducting offline transactions that use a barcode as a method of personal identification) and related services such as to cause infringement of one or more of claims 1–3 of the '689 patent, literally or under the doctrine of equivalents. Further, there are no substantial noninfringing uses for Defendant's products and services.

---

[70] ECF1,, ¶ 10.
[71] ECF1-2.

Read with ¶ 8 and Exhibit B, these allegations plausibly state a contributory infringement claim. Wolverine alleges that, Jamba supplies and configures particular components, its Jamba Rewards app and account system, the User ID Barcode, Jamba's "SERVER(S)", and in store scanners/cash registers and that these components are a material part of the patented method.

These components are especially adapted to conduct offline transactions that use a User ID barcode as personal identification tied to "POINTS AND REWARDS ARE CREDITS" in an account, precisely the method claimed in the '689 Patent. When used as intended and instructed by Jamba, these components have no substantial non infringing use. There is underlying direct infringement by Jamba and/or its customers.

That is sufficient to state a plausible claim of contributory infringement at this stage. Whether Jamba can later identify alleged non infringing uses and whether any such uses are "substantial" are fact issues not properly resolved on a Rule 12(b)(6) motion.

**D.  In the Alternative, Wolverine Should Be Granted Leave to Amend**

Plaintiff respectfully requests leave to amend if the Court is inclined to grant Defendant's Motion to Dismiss in any respect.  Given the liberal standard for amending pleadings, leave to amend is warranted, to permit plaintiff to assert factual allegations and theories, so that Plaintiff's case can be adjudicated on its merits. [72]

**IV. CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendant's Motion is denied.

---

[72] *See Decker v. Infante, Case* No. 19-11654, 2023 U.S. Dist. LEXIS 136881 (E.D. Mich. Aug. 7, 2023); *Bell v. Miller*, Case No. 1:18-cv-522, 2018 U.S. Dist. LEXIS 151438, at *2 (W.D. Mich. 2018).

15

Respectfully Submitted

**Ramey LLP**
*/s/ William P. Ramey, III*
William P. Ramey, III
Texas Bar No. 24027643
446 Heights Blvd., Suite 200
Houston, Texas 77007
(713) 426-3923 (telephone)
wramey@rameyfirm.com

***Attorneys for Wolverine Barcode IP, LLC***

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that all counsel of record who have appeared in this case are being served on this day of April 28, 2026, with a copy of the foregoing via CM/ECF Filing.

*/s/ William P. Ramey, III*
William P. Ramey, III

16